**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

March 13, 2025

LAURA A. AUSTIN, CLERK
BY: _/s/ Amy Fansler_
DEPUTY CLERK

| | |
|---|---|
| **KEVIN WAUGH**, individually and on behalf of all persons similarly situated, : : : | |
| **Plaintiff,** : | **CIVIL ACTION NO.:**  3:25cv00010 |
| : | |
| **v.** : | |
| : | **Class and Collective Action Complaint** |
| **MWP SUPPLY, INC. D/B/A** : | |
| **CARDINAL HOME CENTER,** : | |
| 322 Washington Street, : | |
| Madison, Virginia 22727 : | |
| : | |
| **Defendant.** : | |

## COMPLAINT

This is a collective and class action lawsuit for unpaid wages and unpaid overtime under federal and state law. Plaintiff, Kevin Waugh ("Plaintiff"), on behalf of himself and all current and former non-exempt employees who worked for MWP Supply, Inc. d/b/a Cardinal Home Center ("Cardinal Home" or "Defendant") at any time since the three-year period prior to the date this lawsuit was filed, through the final disposition of this matter (hereinafter "Plaintiff and the Putative Class Members"), by and through their undersigned attorneys, bring this action to recover compensation, liquidated damages, treble damages, and attorneys' fees and costs pursuant to the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. § 216(b), the Virginia Overtime Wage Act, codified at Virginia Code § 40.1-29.3, and the Virginia Wage Payment Act, codified at Virginia Code §§ 40.1-29 et seq. (the Virginia Overtime Wage Act and the Virginia Wage Payment Act, together hereinafter the "Virginia Wage Acts"). Relief under the Virginia Wage Acts includes, but is not limited to, wages owed, liquidated damages, prejudgment interest, reasonable attorneys' fees and costs, and triple damages.

Plaintiff, individually, also brings separate claims for retaliation in violation of the FLSA and Virginia Whistleblower Protection Law, Virginia Code § 40.1-27.3.[1]

## INTRODUCTION

1.      Plaintiff and the Putative Class Members seek to recover unpaid wages and unpaid overtime compensation due and owed to them by Cardinal Home under the FLSA and the Virginia Wage Acts.

2.      Cardinal Home has a policy, pattern, or practice of failing to compensate employees for all earned and accrued wages (including overtime compensation), manipulating time records, maintaining improper time records, and ordering employees to maintain improper records.

3.      Cardinal Home has maintained a practice of adjusting employees' time records so that employees are only paid based on their scheduled shift times, rather than their actual hours worked. On information and belief, Cardinal Home has engaged in such practice since at least the three-year period prior to the date this lawsuit was filed.

4.      Cardinal Home does not pay its employees who work through their lunch breaks. On information and belief, Cardinal Home has maintained this practice since at least the three-year period prior to the date this lawsuit was filed.

5.      Accordingly, Plaintiff brings this action, on behalf of himself and all current and former non-exempt employees who worked for Cardinal Home at any time since the three-year period prior to the date this lawsuit was filed, through the final disposition of this matter, to recover unpaid wages, overtime wages, and related damages and relief.

---

[1] As set forth below, Plaintiff's facts also set forth claims of disability discrimination. Plaintiff filed an EEOC Charge on March 12, 2025, and is requesting an immediate Notice of Right to Sue. Once Plaintiff receives said Notice, Plaintiff will amend this Complaint to bring claims of disability discrimination.

6.    Plaintiff also requests that all similarly situated workers ("Putative Class Members") be notified of the pendency of this action to apprise them of their rights and provide them an opportunity to opt-in to this lawsuit.

7.    Plaintiff brings his claims under the Virginia Wage Acts as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and those similarly situated.

8.    Plaintiff asks that if this case is not certified as a collective action that he be permitted to proceed individually with his claims.

9.    Plaintiff asks that if this case is not certified as a class action that he be permitted to proceed individually with his claims.

10.    Further, after reporting Cardinal Home's failure to pay wages, Cardinal Home retaliated against Plaintiff by terminating his employment.

11.    In addition, in the alternative, Cardinal Home targeted Plaintiff based on his disabilities, leading to his discriminatory discharge.

## JURISDICTION AND VENUE

12.    Jurisdiction over Plaintiff's FLSA claims is proper under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331. Any claims arising under state law, including those under the Virginia Wage Acts, are properly before this Court under 28 U.S.C. § 1367.

13.    Venue in this Court is proper under 28 U.S.C. § 1391. Plaintiff worked in this District, Defendant conducts business in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred within this District.

## THE PARTIES

14.    Plaintiff Kevin Waugh is an adult resident of Madison, Virginia and former non-exempt employee of Cardinal Home. Plaintiff has given his written consent to bring this action to

collect unpaid wages under the FLSA and the Virginia Wage Acts. Plaintiff's consent form is being filed along with this Complaint pursuant to 29 U.S.C. § 216(b) and is attached as **Exhibit 1.**

15.     The Putative Class Members are those current and former non-exempt hourly wage employees employed by Cardinal Home at any time since the three-year period prior to the date this lawsuit was filed, through the final disposition of this matter and who have been subjected to the same illegal pay policies and practices under which Plaintiff worked and was paid.

16.     Defendant is a domestic for-profit corporation registered in the Commonwealth of Virginia.

17.     Defendant is in the business of providing builders, contractors, and homeowners with building supplies, including but not limited to: paint, lumber, cabinets, blinds, shades, windows, doors, composite decking, fencing, plumbing & HVAC, siding, plywood, masonry, hardware, and tools.

18.     Defendant maintains locations throughout western Virginia, including in Charlottesville, Staunton, Mineral, Waynesboro, and Madison.

19.     Defendant is currently headquartered at 322 Washington Street, Madison, Virginia 22727.

20.     Process may be served on Defendant's registered agent, John Michael Price, at 322 Washington Street, Madison, Virginia 22727.

## FACTS RELATED TO COLLECTIVE AND CLASS CLAIMS

21.     Plaintiff worked for Defendant from on or about August 1, 2022 until November 6, 2024.

22.     During the entire time Defendant employed Plaintiff, Plaintiff was a non-exempt employee earning an hourly wage.

23.     Plaintiff began his employment with Defendant by working the sales counter in Defendant's store located at 5221 Rockfish Gap Turnpike, Charlottesville, Virginia 22903 ("Crozet location").

24.     In or around February 2023, Plaintiff applied for a different role as Inventory Controller, and subsequently began that job in May 2023.

25.     Plaintiff's duties as Inventory Controller included without limitation performing inventory counts, reconciling discrepancies in inventory records, and collaborating with store management regarding inventory matters.

26.     While serving as Inventory Controller, from May 2023 until November 2024, Plaintiff worked on average 44 hours per workweek.

27.     Plaintiff received frequent calls from one of Cardinal Home's human resources ("HR") representatives between August 2022 and May 2023. During these calls, Cardinal Home's HR representative informed Plaintiff that even if he did not take a lunch break, it was Cardinal Home's policy and practice to not pay employees when working through a lunch hour.

28.     In or around July 2023, Tina Goodwin ("Ms. Goodwin") began working for Cardinal Home as HR Director. *See* Goodwin Decl. (attached as **Exhibit 2**) at ¶¶ 4-5.

29.     In her role as HR Director, Ms. Goodwin was responsible for all HR duties, including reviewing employees' timesheets. **Exhibit 2** at ¶ 6.

30.     During times relevant to this Complaint, Defendant employed approximately over 100 non-exempt employees earning hourly wages. *See e.g.*, **Exhibit 2** at ¶ 10.

31.     During the time that Cardinal Home employed Ms. Goodwin, she reported directly to Cardinal Home's Chief Financial Officer ("CFO"), Dena Deal. **Exhibit 2** at ¶ 8.

32.    Defendant employed Plaintiff and the Putative Class Members to work at varying times, per scheduled shifts. Plaintiff and the Putative Class Members' shifts were regularly scheduled at varying times throughout the day depending on the needs of any of Defendant's various locations.

33.    Plaintiff and/or the Putative Class Members, on numerous occasions, arrived early for their shift and began working. In those instances, Plaintiff and the Putative Class Members would clock in when they began working so that they may be compensated for all hours worked.

34.    In addition Plaintiff and/or the Putative Class Members, on numerous occasions, worked through their lunch breaks.

35.    In those instances, Plaintiff and the Putative Class Members would report working through their lunch break or remain "clocked in" so that they may be compensated for all hours worked.

36.    Further Plaintiff and/or the Putative Class Members, on numerous occasions, worked later than their scheduled shifts. In those instances, Plaintiff and the Putative Class Members would clock out only when they had completed work for the day so that they may be compensated for all hours worked.

37.    When Plaintiff and Putative Class Members arrived early for their shift or stayed later than scheduled performing integral and indispensable tasks necessary for the performance of their job duties, Defendant adjusted Plaintiff's and the Putative Class Members' time records to reflect only the hours they were scheduled to work, rather than the hours actually worked; as a result, Defendant paid Plaintiff and the Putative Class Members based on their scheduled shift times, not the hours they actually worked.  *See* **Exhibit 2** at ¶¶ 13, 17, 19.

38.     Plaintiff and Putative Class Members reported to Ms. Goodwin that they were not paid when working through breaks or lunch. *See* **Exhibit 2** at ¶ 18.

39.     Upon information and belief, when Plaintiff and Putative Class Members worked through their breaks (inclusive of lunch breaks), Defendant adjusted Plaintiff's and the Putative Class Members' time records so as to not compensate the employees for the time spent working through their lunch breaks.

40.     Upon information and belief, this practice of adjusting employees' time records impacted all of Cardinal Home's non-exempt hourly employees, including Plaintiff and the Putative Class Members.

41.     Upon information and belief, Defendant manually adjusted hours in this manner so that its employees would be compensated only for their scheduled hours, not the hours they actually worked.

42.     As a direct result of Defendant's manipulation of its non-exempt employees' time records, Plaintiff and Putative Class Members were not compensated properly, including not being paid for hours worked including overtime pay.

43.     Upon review of Plaintiff's time records from November 2022 to November 2024, Cardinal Home's practice of manipulating time records resulted in a loss of compensation for over 200 hours that were actually worked by Plaintiff, inclusive of overtime hours.

44.     Ms. Goodwin raised issues directly to Cardinal Home's CFO about Cardinal Home's practice and policy of adjusting non-exempt hourly employees' time records so that the employees were not paid for the hours they actually worked. **Exhibit 2** at ¶ 14, .

45.     Each time Ms. Goodwin raised issues with Cardinal Home's pay policies and practices to the CFO, the CFO instructed HR personnel and managers to continue the practice of

adjusting the non-exempt hourly employees' time records to reflect that the employees worked only their scheduled shift time, rather than any hours worked outside of that shift. **Exhibit 2** at ¶ 15.

46.     Despite Ms. Goodwin raising issues and complaints regarding these pay practices, Cardinal Home continued its policy and practice of only paying its employees based on their scheduled shifts and/or scheduled breaks. *See* **Exhibit 2** at ¶ 19.

47.     Ultimately, Ms. Goodwin resigned her employment with Cardinal Home, in part because she did not feel comfortable with Cardinal Home's payroll practices. **Exhibit 2** at ¶ 20.

48.     In addition, in August 2024, Plaintiff disclosed to his direct supervisor, Manager of Information Systems Anthony Burke, that Plaintiff believed adjustments were being made to his timesheets to not accurately reflect his time worked. Mr. Burke responded by telling Plaintiff not to work overtime; however, no adjustments were made to Plaintiff's pay to compensate Plaintiff for wages that he had earned, including unpaid overtime pay.

49.     As further explained below, Plaintiff's disclosures ultimately led to his termination.

50.     Instead, to ensure that Cardinal Home was continuing the policies and practices described above, Cardinal Home's managers and its CFO required that the hours recorded be changed to reflect Cardinal Home's non-exempt hourly employees' scheduled shift times only. **Exhibit 2** at ¶ 17.

51.     Upon information and belief, Cardinal Home is still paying its employees earning an hourly wage pursuant to these unlawful policies and practices.

### FACTS RELATED TO PLAINTIFF'S UNLAWFUL TERMINATION

52.     Plaintiff worked for Defendant from on or about August 1, 2022 until November 6, 2024.

53.     Plaintiff began his employment with Defendant by working the sales counter at Defendant's Crozet location.

54.     During the entire time Defendant employed Plaintiff, Plaintiff was a non-exempt employee earning an hourly wage.

55.     Since the beginning of employment, Plaintiff openly discussed a prior traumatic head injury that Plaintiff suffered, which has left him disabled. Specifically, among other disabilities, Plaintiff suffers from Post-Traumatic Stress Disorder ("PTSD"), Major Depressive Disorder, and Post-concussion Syndrome ("PCS").

56.     At the outset of employment, Plaintiff discussed his disabilities with Vice President Allen Aylor, along with colleagues, and openly discussed difficulties related to his disabilities, including without limitation, headaches, blurred vision, lightheadedness, temporary confusion, and emotional swings. In addition, during Plaintiff's first year of employment, Plaintiff had to leave the Crozet location and go immediately to the emergency room due to complications related to Plaintiff's disabilities.

57.     As such, Cardinal Homes has been aware of Plaintiff's disabilities since the outset of his employment.

58.     Nonetheless, despite Plaintiff's disabilities, Plaintiff succeeded in his role and received only positive feedback.

59.     On or about February 7, 2023, Cardinal listed a job opening for an Inventory Controller. Plaintiff expressed his interest in the position to Mr. Aylor. Eventually, Plaintiff discussed the role with Mr. Aylor and Cardinal's President, Toby Allen.

60.     Ultimately, Cardinal selected Plaintiff for the role; and Plaintiff began as Inventory Controller in or around May 2023, reporting to Manager of Information Systems, Anthony Burke.

61.     Plaintiff's duties as Inventory Controller included without limitation performing inventory counts, reconciling discrepancies in inventory records, and collaborating with store management regarding inventory matters.

62.     In May 2023, Plaintiff discussed his disabilities with Mr. Burke and the effects that Plaintiff's disabilities have on his mental focus and his emotional reactions to certain situations.

63.     Shortly thereafter, Mr. Burke requested a meeting with Plaintiff and then Human Resources ("HR") Director Tina Goodwin. During that meeting, Mr. Burke, without justification, asked if Plaintiff "had a problem working for him," to which Plaintiff responded he did not.

64.     While serving as Inventory Controller, from May 2023 until November 2024, Plaintiff worked on average 44 hours per workweek.

65.     Plaintiff received frequent calls from one of Cardinal Home's HR representatives between August 2022 and May 2023. During these calls, Cardinal Home's HR representative informed Plaintiff that even if he did not take a lunch break, it was Cardinal Home's policy and practice to not pay employees when working through a lunch hour.

66.     Cardinal Home was constantly worried about employees' hours worked. Based on Plaintiff's own investigation, Plaintiff discovered that his timesheets in Cardinal Home's ADP system only reflected his scheduled shift hours, instead of his hours actually worked.

67.     As such, Plaintiff became worried about reporting his actual hours worked and, on occasion, would clock out early over fear of retaliation for working overtime.

68.     On or about August 1, 2024, Plaintiff had a discussion with the Crozet Store Manager and Crozet Assistant Manager about an inventory issue. They placed multiple calls to Plaintiff that day, asking repeated questions. On one call, both managers began talking at Plaintiff at the same time, which triggered symptoms related to Plaintiff's disabilities.

69.     After that call, the Crozet Store Manager called Mr. Burke to discuss the inventory issue further. Mr. Burke came by Plaintiff's office to question Plaintiff, and Plaintiff explained that when Plaintiff has too many "inputs" (e.g., here, people talking at Plaintiff at the same time), it can sometimes trigger symptoms due to Plaintiff's disabilities. As a result, Plaintiff had just put Mr. Burke on notice that the incident had triggered symptoms related to Plaintiff's disabilities.

70.     The Crozet Store Manager later informed Plaintiff that calling Mr. Burke was likely a mistake.

71.     Further, in August 2024, Plaintiff disclosed to Mr. Burke that Plaintiff believed adjustments were being made to his timesheets to not accurately reflect Plaintiff's time worked. Mr. Burke responded by telling Plaintiff not to work overtime; however, no adjustments were made to Plaintiff's pay to compensate Plaintiff for all hours worked.

72.     On or about September 12, 2024, Plaintiff overheard a Cardinal Home delivery driver named Mike and Sales Representative Linda Stadler discussing the amount of space Plaintiff's Diet Coke was taking up in the refrigerator.

73.     Plaintiff got up and went toward the refrigerator. Plaintiff then politely asked if there was any issue and stated that Mike is free to discuss the issue with Plaintiff.

74.     Mike, however, immediately became agitated with Plaintiff. Both Mike and Plaintiff raised their voices, and then Mike threatened Plaintiff with bodily harm, stating that he could run Plaintiff over with his truck. He also stated that the only thing saving Plaintiff was the fact that the building had security cameras. This threat of violence was particularly concerning because Plaintiff was in the process of building and renovating a home utilizing Cardinal supplies and Mike, as a Cardinal delivery driver, had been to the house and knew where Plaintiff lived.

75.    The escalated conversation continued, but Plaintiff never threatened Mike. Instead, Plaintiff sought to de-escalate the situation and searched for a manager. Ultimately, Plaintiff found Barry Tucker, the Madison Assistant Store Manager, and disclosed the incident that had occurred.

76.    Nonetheless, after Plaintiff returned to his office, Plaintiff overheard Mike discussing what he "would have done" to Plaintiff. Plaintiff then called Mr. Tucker to explain that Plaintiff was still being threatened and mocked.

77.    Given that Plaintiff had raised his voice and had a verbal altercation with an employee in front of other employees, Plaintiff sought out Ms. Stadler to apologize, along with other employees who may have overheard.

78.    Ms. Stadler, however, refused to accept Plaintiff's apology and stated that Plaintiff had "mental issues" and "needs help." Ms. Stadler was aware of Plaintiff's disabilities.

79.    Thereafter, Mr. Allen called Plaintiff to his office. When Plaintiff arrived, Mr. Allen was there along with Chief Financial Officer Dena Deal, Matt Utz, the Madison Store Manager, and Mr. Tucker.

80.    Plaintiff immediately expressed that this was a very distressing situation due to his disabilities and Plaintiff began to cry throughout the meeting, rendering him unable to talk at times.

81.    As Plaintiff spoke about the incident, Plaintiff could barely catch his breath, but was able to express his concerns about violence in the workplace. The individuals in the room, however, largely defended Mike, but admitted that they had known Mike from childhood and that he was a "bully" in his youth.

82.    Nonetheless, Mr. Allen called Plaintiff into another meeting, informing Plaintiff that Plaintiff could not come into the office on Friday or Saturday that week, stating that Plaintiff's "story" did not match what others had said. Plaintiff repeated that Plaintiff was not the one who

threatened anyone with violence. Plaintiff again reiterated that Mike knew where Plaintiff lived and that Plaintiff feared for his safety.

83.     After the meeting, Plaintiff called Mr. Tucker to make sure that Mike no longer delivered anything to Plaintiff's house. Mr. Tucker did not answer the phone, so Plaintiff left a voicemail.

84.     Plaintiff returned to work on Monday, September 16, 2024, and Mr. Allen called Plaintiff to his office where he, Ms. Deal, and Mr. Burke were waiting.

85.     First, Mr. Allen mentioned that they consulted with an HR company and that Cardinal is required to pay Plaintiff for all time worked. This was an apparent reference to Plaintiff's disclosures about not being paid for time worked a few weeks prior. However, after the meeting and Plaintiff's termination, Cardinal never paid Plaintiff for all hours worked.

86.     Second, Mr. Allen claimed that Plaintiff's use of expletives was equal to Mike's physical threats against Plaintiff.

87.     Third, Mr. Burke delivered to Plaintiff an August 1, 2024 incident report regarding the discussion Plaintiff had with the Crozet Store Manager and Crozet Assistant Manager about an inventory issue. As explained above, that incident and subsequent discussions with Mr. Burke were directly related to Plaintiff's disabilities. At that time, no discipline or counseling was issued to Plaintiff. However, Plaintiff had just received an Incident Report backdated to August 1, 2024.

88.     Mr. Burke also delivered an August 13, 2024 Incident Report to Plaintiff. That Incident Report claimed that Plaintiff had taken excessive overtime without approval. Again, these alleged incidents were not reported to Plaintiff previously, and the Incident Report was backdated to August 13, 2024. Plaintiff also informed Mr. Burke that the time records in Cardinal's ADP

system did not demonstrate Plaintiff's actual hours worked and, instead, only reflected Plaintiff's scheduled hours. Ms. Deal confirmed that was the case.

89.    Fourth, and finally, Mr. Burke delivered to Plaintiff a Performance Improvement Plan ("PIP") related to "inappropriate conduct" based on the August 1, 2024 and September 12, 2024 events described above. Upon information and belief, Mike is not disabled and Cardinal did not issue Mike a PIP or other Incident Reports.

90.    Unfortunately, thereafter, the antagonism against Plaintiff only continued. Management was looking for any reason to terminate Plaintiff in retaliation for his disclosures and based on Plaintiff's disabilities.

91.    Plaintiff had been ostracized. Many colleagues would not speak with Plaintiff, and Mr. Burke did not engage with Plaintiff in the same manner as he previously had.

92.    Ultimately, after receiving a new computer that Plaintiff had requested for months to be able to do his job more efficiently, on or about November 4, 2024, Mr. Burke summoned Plaintiff to a conference room with Ms. Deal and a new HR Manger, Lauren Crowell.

93.    In that meeting, Mr. Burke accused Plaintiff of creating "system compromises" to Cardinal Home computer systems. In reality, the accusations were vague and unclear, but Mr. Burke claimed that Plaintiff was accessing certain information without authority. Other than those vague claims, Cardinal never articulated that Plaintiff violated any policy or otherwise did anything without authority.

94.    Cardinal Home suspended Plaintiff that day, without pay, while it allegedly conducted an investigation.

95.    On November 6, 2024, Cardinal then terminated Plaintiff's employment based on the investigation.

96.     In reality, Cardinal Home terminated Plaintiff in retaliation for his protected disclosures and based on disability discrimination.

97.     On March 12, 2025, Plaintiff filed a Charge of Discrimination with the EEOC.

98.     Plaintiff has requested a Notice of Right to Sue and will amend this Complaint once received to assert claims of disability discrimination under the law.

## COUNT ONE
**Unpaid Overtime in Violation of the Fair Labor Standards Act**
**29 U.S.C. § 207**
**(Collective Action by Plaintiff and All Persons Similarly Situated against Defendant)**

99.     All previous paragraphs are incorporated as though fully set forth herein.

100.    Cardinal Home is a "person" within the meaning of the FLSA. *See* 29 U.S.C. § 203(a).

101.    Cardinal Home is an "employer" within the meaning of the FLSA. *See* 29 U.S.C. § 203(d).

102.    Cardinal Home is subject to the wage requirements of the FLSA and was subject to the same at all times relevant to this Complaint.

103.    During all times relevant to this Complaint, Plaintiff and the Putative Class Members were covered employees entitled to the above-described FLSA protections. *See* 29 U.S.C. § 203(e).

104.    Plaintiff and the Putative Class Members are not exempt from the requirements of the FLSA.

105.    The FLSA requires that employers compensate non-exempt employees at a rate of not less than one and one-half times their regular rate of pay ("Overtime Rate") for all hours worked in excess of forty (40) hours per week. *See* 29 U.S.C. § 207(a)(1).

106.    At all relevant times, Defendant, pursuant to its policies and practices, failed and refused to pay Plaintiff and the Putative Class Members for all hours worked by them, including for pre-shift and post-shift work performed, in addition to when Plaintiff and the Putative Class Members worked through their lunch breaks. These policies and practices resulted in Cardinal Home failing to compensate Plaintiff and the Putative Class Members all wages, inclusive of their Overtime Rate for hours worked in excess of forty (40) hours per week.

107.    At all times relevant to this Complaint, Cardinal Home knew or ought to have known that it had a duty to pay Plaintiff and the Putative Class Members all wages, inclusive of their Overtime Rate for hours worked in excess of forty (40) hours per week.

108.    Ms. Goodwin specifically raised issues to Cardinal Home's CFO about Cardinal Home's policies and practices. But still, the CFO instructed HR personnel and managers to continue the practice of adjusting the non-exempt hourly employees' time records to reflect that the employees worked only their scheduled shift time, rather than any hours worked outside of that shift. Cardinal Home continued its policy and practice of only paying its employees based on their scheduled shifts and/or scheduled breaks rather than paying its employees for actual hours worked

109.    Cardinal Home's failure to change its policies and practices after being notified by Ms. Goodwin of the issues and concerns with them was in reckless disregard of the law.

110.    Cardinal Home had no good faith basis to believe that these employees were not entitled to overtime under the FLSA.

111.    Thus, Cardinal Home violated the FLSA.

112.    Cardinal Home's violation of the FLSA was willful.

## COUNT TWO
### Wage Theft in Violation of Virginia Law

**Virginia Code § 40.1-29**
**(Class Action by Plaintiff and All Persons Similarly Situated against Defendant)**

113.    All previous paragraphs are incorporated as though fully set forth herein.

114.    The Virginia Wage Payment Act prohibits all employers from withholding any part of the wages of any employee, except for payroll, wage, or withholding taxes or in accordance with the law, without the written and signed authorization of the employee. *See* Va. Code § 40.1-29.

115.    Plaintiff never gave his written and signed authorization for Cardinal Home to withhold his wages for his actual hours worked in favor of being paid for only his scheduled shift hours.

116.    The Putative Class Members never gave their written and signed authorization for Cardinal Home to withhold their wages for their actual hours worked in favor of being paid for only their scheduled shift hours.

117.    At all relevant times, Defendant, pursuant to its policies and practices, failed and refused to pay Plaintiff and the Putative Class Members for all actual hours worked by them, including for pre-shift and post-shift work performed, in addition to when Plaintiff and the Putative Class Members worked through their lunch breaks.

118.    At all times relevant to this Complaint, Cardinal Home knew or ought to have known that it had a duty to pay Plaintiff and the Putative Class Members for all actual hours worked and that it could not withhold payment for wages without Plaintiff's and the Putative Class Members' written and signed authorization.

119.    Ms. Goodwin specifically raised issues to Cardinal Home's CFO about Cardinal Home's policies and practices. But still, the CFO instructed HR personnel and managers to continue the practice of adjusting the non-exempt hourly employees' time records to reflect that the employees worked only their scheduled shift time, rather than any hours worked outside of that

shift. Cardinal Home continued its policy and practice of only paying its employees based on their scheduled shifts and/or scheduled breaks rather than paying its employees for actual hours worked

120.    Cardinal Home's failure to change its policies and practices after being notified by Ms. Goodwin of the issues and concerns with them was in knowing disregard of Virginia law.

121.    Cardinal Home had no good faith basis to believe that these employees were not entitled to their wages for all hours actually worked.

122.    Thus, Cardinal Home violated the Virginia Wage Payment Act.

123.    Cardinal Home knowingly violated the Virginia Wage Payment Act.

### COUNT THREE
**Unpaid Overtime in Violation of the Virginia Overtime Wage Act**
**Virginia Code § 40.1-29.2**
**(Class Action by Plaintiff and All Persons Similarly Situated against Defendant)**

124.    All previous paragraphs are incorporated as though fully set forth herein.

125.    The Virginia Overtime Wage Act requires that employers compensate non-exempt employees consistent with the FLSA, meaning at a rate of not less than one and one-half times their regular rate of pay ("Overtime Rate") for all hours worked in excess of forty (40) hours per week. *See* Va. Code § 40.1-29.2; *see also* 29 U.S.C. § 207(a)(1).

126.    At all relevant times, Defendant, pursuant to its policies and practices, failed and refused to pay Plaintiff and the Putative Class Members for all hours worked by them, including for pre-shift and post-shift work performed, in addition to when Plaintiff and the Putative Class Members worked through their lunch breaks. These policies and practices resulted in Cardinal Home failing to compensate Plaintiff and the Putative Class Members all wages, inclusive of their Overtime Rate for hours worked in excess of forty (40) hours per week.

127.    At all times relevant to this Complaint, Cardinal Home knew or ought to have known that it had a duty to pay Plaintiff and the Putative Class Members all wages, inclusive of their Overtime Rate for hours worked in excess of forty (40) hours per week.

128.    Cardinal Home was aware that its policies and practices of manipulating its non-exempt hourly employees' payroll records, including those of Plaintiff and the Putative Class Members, resulted in Cardinal Home maintaining inaccurate records of hours worked in violation of the Virginia Overtime Wage Act.

129.    Ms. Goodwin specifically raised issues to Cardinal Home's CFO about Cardinal Home's policies and practices. But still, the CFO HR personnel and managers to continue the practice of adjusting the non-exempt hourly employees' time records to reflect that the employees worked only their scheduled shift time, rather than any hours worked outside of that shift. Cardinal Home continued its policy and practice of only paying its employees based on their scheduled shifts and/or scheduled breaks rather than paying its employees for actual hours worked.

130.    Cardinal Home's failure to change its policies and practices after being notified by Ms. Goodwin of the issues and concerns with them was in reckless disregard of the law.

131.    Cardinal Home had no good faith basis to believe that these employees were not entitled to overtime under the Virginia Overtime Wage Act.

132.    Thus, Cardinal Home violated the Virginia Overtime Wage Act.

133.    Cardinal Home knowingly violated the Virginia Overtime Wage Act.

## **COUNT FOUR**
**Discrimination and Retaliation in Violation of the Fair Labor Standards Act**
**(On behalf of Plaintiff Only)**

134.    All previous paragraphs are incorporated as though fully set forth herein.

135.    Plaintiff engaged in protected activity by informing Cardinal Home, and his direct supervisors, that Cardinal Home was violating the law by not paying him for time worked, inclusive of overtime pay in violation of the FLSA.

136.    Cardinal Home discriminated and retaliated against Plaintiff by terminating Plaintiff's employment.

137.    Cardinal Home would not have terminated Plaintiff's employment but for Plaintiff's assertions that Defendant was in violation of the law by failing to pay Plaintiff wages, inclusive of overtime pay.

138.    Cardinal Home terminated Plaintiff's employment because of Plaintiff's complaints about unpaid wages.

139.    Defendant's discriminatory and retaliatory conduct prejudiced Plaintiff in that he lost compensation and benefits, sustained other monetary losses, and suffered the loss of his employment as a direct result of Defendant's violation.

140.    At all times material hereto, Defendants engaged in such unlawful practices with bad faith, malice, or reckless indifference to the federally protected rights of Plaintiff so as to support an award of liquidated damages.

141.    The above-described acts by Defendant and employees of Defendant constitute unlawful discrimination and retaliation in violation of the FLSA.

## COUNT FIVE
**Retaliation in Violation of the Virginia Whistleblower Protection Law**
**(On behalf of Plaintiff Only)**

142.    All previous paragraphs are incorporated as though fully set forth herein.

143.    The Virginia Whistleblower Protection Law, Virginia Code § 40.1-27.3 (the "Act"), prohibits employers from discharging, disciplining, threatening, discriminating against, or

penalizing an employee, or from taking other retaliatory action with respect to the employee's compensation, terms, conditions, location, or privileges of employment, because the employee engages in protected activity. Va. Code § 40.1-27.3(A).

144.    Protected activity under the Act includes reporting in good faith violations of any federal or state law or regulation, either internally to a supervisor or to any governmental body or law enforcement official, and refusing an employer's order to perform an action that violates any federal or state law or regulation and the employee informs the employer that the order is being refused for that reason. Va. Code § 40.1-27.3(A)(1).

145.    Virginia Code § 40.1-27.3(C) creates a private cause of action for violations of Virginia Code § 40.1-27.3, which allows the Court to award "the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent position," and "compensation for lost wages, benefits, and other renumeration, together with interest thereon, as well as reasonable attorney fees and costs." Va. Code § 40.1-27.3(C).

146.    Plaintiff engaged in protected activity by informing Cardinal Home, and his direct supervisors, that Cardinal Home was violating the law by not paying him for time worked, inclusive of overtime pay, in violation of the FLSA and Virginia Wage Acts.

147.    Cardinal Home retaliated against Plaintiff by terminating Plaintiff's employment.

148.    Cardinal Home would not have terminated Plaintiff's employment but for Plaintiff's assertions that Defendant was in violation of the law by failing to pay Plaintiff wages, inclusive of overtime pay.

149.    Cardinal Home terminated Plaintiff's employment because of Plaintiff's complaints about unpaid wages.

150.    The reasons given by Cardinal Home for Plaintiff's termination from employment are false.

151.    Cardinal Home's termination of Plaintiff constituted unlawful retaliation in violation of § 40.1-27.3.

152.    As a result of Cardinal Home's actions, Plaintiff has suffered damages, including lost compensation and benefits and other renumeration.

## CLASS DEFINITIONS

153.    Plaintiff brings Count One of this action as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of himself and the following class of potential opt-in litigants:

Any individual who: (1) works/worked for MWP Supply, Inc. d/b/a Cardinal Home Centers ("Cardinal Home"); (2) is/was paid an hourly wage; (3) was/is not exempt from overtime laws; and (4) works/worked over forty (40) hours during any week since the three-year period prior to the date this lawsuit was filed (hereinafter the "FLSA Class").

154.    Plaintiff brings Count Two of this action as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and the following class:

Any individual currently or formerly employed by MWP Supply, Inc. d/b/a Cardinal Home Centers ("Cardinal Home") who (1) is/was paid an hourly wage and (2) works/worked at least one workweek since the three-year period prior to the date this lawsuit was filed (hereinafter the "Virginia Wage Theft Class").

155.    Plaintiff brings Count Three of this action as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and the following class:

Any individual currently or formerly employed by MWP Supply, Inc. d/b/a Cardinal Home Centers ("Cardinal Home") who (1) is/was paid an hourly wage; (2) was/is not exempt from overtime laws; and (3) works/worked over forty (40) hours during any week since the three-year period prior to the date this lawsuit was filed (hereinafter the "Virginia Overtime Class").

156.    The Virginia Wage Theft Class and the Virginia Overtime Class are together referred to as the "Virginia Classes."

157.    The FLSA Class and the Virginia Classes are together referred to as the "Classes."

158.    Plaintiff reserves the right to redefine the Classes and assert claims on behalf of other classes prior to notice or class certification, and thereafter, as necessary.

## COLLECTIVE ACTION ALLEGATIONS FOR FLSA CLAIMS

159.    All previous paragraphs are incorporated as though fully set forth herein.

160.    Plaintiff files this statutorily authorized collective action pursuant to 29 U.S.C. § 216(b) as a Representative Plaintiff.

161.    There are more than 50 members in the FLSA Class. In fact, the class is estimated to include over 100 members. *See* **Exhibit 2** at ¶ 10.

162.    At all times relevant to this Complaint, Plaintiff and the Putative Members of the FLSA Class have been entitled to the rights, protections, and benefits provided under the FLSA.

163.    Plaintiff and the Putative Members of the FLSA Class were together victims of the same policies and practices where Cardinal Home maintained inaccurate payroll records.

164.    Plaintiff and the Putative Members of the FLSA Class were together victims of the same pay policies and practices by Cardinal Home that deprived them of wages (including overtime compensation).

## CLASS ALLEGATIONS FOR VIRGINIA WAGE CLAIMS

165.    All previous paragraphs are incorporated as though fully set forth herein.

166.    The number and identity of the Virginia Classes are ascertainable from Defendant's records.

167.    There are more than 50 members in the Virginia Classes. In fact, the classes are estimated to each include over 100 members. *See* **Exhibit 2** at ¶ 10. As such, joinder is impracticable.

168.    Certification of current and former employees is the most efficient and economical means of resolving questions of law and fact that are common to the claims of the Plaintiff and the Putative Class Members. Proceeding on an individual basis will require the filing of potentially scores of duplicative individual suits which would cause a waste of judicial time and resources and create the risk of inconsistent or varying adjudications of common issues.

169.    Cardinal Home's practice of manipulating time records to reflect only the scheduled shift times, rather than the actual hours worked, presents common issues of fact in this matter. The challenged pay policies and practices apply uniformly and present identical questions of law and fact with respect to Plaintiff and those he seeks to represent.

170.    The claims of the class representative, Plaintiff Kevin Waugh, is typical of those of the class members as a whole in that their claims are based on the same business and compensation practices. The relief sought by the class representative for unpaid wages, including overtime wages, is typical of the relief which is sought on behalf of the Classes.

171.    Plaintiff is an adequate class representative for all classes. His interests are co-extensive with those of the members of the Classes that he seeks to represent. Additionally, there is substantial overlap amongst the membership of the Classes.

172.    The questions of law and facts common to Plaintiff and the Putative Class Members predominate over any questions affecting only individual members.

173.    The Putative Class Members do not have a substantial interest in individually controlling a separate action because any such claim would be based on the same pay policies or practices by Defendant and their recovery in either an individual or class action will be based on the amount of wages, overtime compensation, or other damages that each Plaintiff has been denied by Defendant.

174.    Plaintiff and counsel are not aware of any other litigation concerning the controversy outlined herein that has already begun by proposed class members within the Commonwealth of Virginia.

175.    It is desirable to concentrate the claims in this forum because the Defendant conducts business in this forum and the employment practices complained of with respect to the Plaintiff and Putative Class Members occurred in this forum.

176.    Plaintiff and counsel do not foresee any substantial difficulties in managing a class action.

### **RELIEF REQUESTED**

Wherefore, Plaintiff and the Putative Class Members request the following Relief against Defendant:

a.    An order conditionally certifying a group or groups of Putative Collective Action Members for the FLSA Class and approving a notice to be sent to all such members, notifying them of this representational lawsuit and their ability to file a written consent to join in this action without threat or fear of reprisal;

b.    Certification of the Virginia Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

c.    Judgment against Defendant for violations of the overtime provisions of the FLSA and Virginia Wage Acts;

d.    All unpaid wages or benefits due to the Plaintiff and the Putative Class Members as a result of Defendant's policy and practice of manipulating employees' time records to reflect only scheduled shift hours, rather than actual hours worked;

e.    Judgment that Defendant's violations of the FLSA were willful;

f.  Judgment that Defendant knowingly violated the Virginia Wage Acts;

g.  Liquidated damages equal to the unpaid wage compensation and/or unpaid overtime due under the FLSA and Virginia Wage Acts;

h.  Treble damages under Virginia Code § 40.1-29(J) for all claims where such relief is available;

i.  Pre-judgment and post-judgment interest;

j.  Reasonable attorneys' fees and costs, including expert fees expended in the prosecution of this case and the investigation that preceded it;

k.  Leave to amend to bring additional claims and/or parties, including but not limited to allowing all named and opt-in Plaintiffs to proceed with their individual claims should this case not proceed as a collective or class action for any reason; and

l.  Any and all further relief permissible by law.

Wherefore, Plaintiff, as to his individual claims, requests the following Relief against Defendant:

a.  Entry of judgment in favor of Plaintiff;

b.  An award of actual damages plus liquidated damages in an amount to be proven at trial, but not less than $500,000;

c.  Other renumeration;

d.  Plaintiff's attorney's fees and costs of this action; and

e.  Any and other such further relief that this Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby requests a TRIAL BY JURY for all claims and issues so triable.

Respectfully submitted,
Kevin Waugh, Individually and on behalf of
all others similarly situated,
Plaintiff


By: */s/ Mark J. Passero*_____
Mark J. Passero (VSB No. 90463)
Alicia M. Penn-Taylor (VSB No. 94937)
LawrenceQueen
701 E. Franklin Street, Suite 700
Richmond, VA 23219
Telephone: (804) 643-9343
Fax: (804) 643-9368
mpassero@lawrencequeen.com
apenntaylor@lawrencequeen.com

*Attorneys for Plaintiff*